**F.A. TETER, et al., Respondents,**

v.

**Lyle SPILLMAN, Appellant.**

**No. WD 45014.**

Missouri Court of Appeals,
Western District.

May 12, 1992.

Terry M. Evans, Robert V. Krueger, Stockard, Andereck, Hauck, Sharp & Evans, Trenton, for appellant.

David Collins, Collins & Grimm, Macon, for respondents.

Before TURNAGE, P.J., and KENNEDY and BERREY, JJ.

TURNAGE, Presiding Judge.

F.A. Teter and his wife, Joann Teter; Billy Teter and his wife, Betty Teter; and Larry D. Hyde and his wife, Dallie M. Hyde, brought suit against Lyle Spillman for fraud. After a jury trial, a verdict was returned awarding F.A. Teter and Joann Teter $46,954.76 in actual damages and $30,301.64 in punitive damages, Billy Teter and Betty Teter $11,705.40 in actual damages and $7,666.68 in punitive damages, and Larry Hyde and Dallie Hyde $11,705.40 in actual damages and $7,666.68 in punitive damages.[1] The court entered judgment on the verdict and Spillman contends that the court erred in excluding evidence and that there was no evidence of damages. Affirmed.

In the spring of 1984, Arthur Allen and his wife owned 55.2% of the outstanding shares in Callao Bancshares. Allen advertised to sell his shares after he had undergone heart surgery. Spillman contacted Allen with reference to buying his shares and in the course of negotiations, Spillman

---

1. This case was tried in Adair County on a change of venue.

talked with an officer of the Citizens Bank and Trust of Chillicothe which held a note executed by Callao Bancshares evidencing a loan with a balance at that time of $396,-851.00. On April 16, 1984, Citizens Bank wrote Spillman in which it acknowledged a telephone conversation of that day regarding the proposed purchase of shares in Callao Bancshares by Spillman from Allen. Citizens Bank gave its commitment to continue to loan funds to Callao Bancshares in the approximate amount of $400,000.00 over a five-year period.

On April 23, 1984, Spillman entered into a contract with the Allens for the purchase of 458 shares of Callao Bancshares. As consideration Spillman agreed to convey a one-half interest in certain real estate which in the contract was valued at $25,-000.00, to pay $2,500.00 at the execution of the agreement with a proviso that under certain conditions $2,400.00 of that amount would be returned to Spillman, and Spillman agreed to give the Allens his promissory note in the amount of $35,000.00 in return for the Allens agreeing to execute a covenant not to compete in the banking business in Macon County for five years after the closing date of the sale. It is conceded that Spillman received a refund of $2,400.00 of the $2,500.00 which he paid down at the signing of the contract. In addition, the Allens received $850.00 rent from the person farming the land which Spillman agreed to convey. In total, Spillman paid $100.00 down, $25,000.00 as the value of the one-half interest in the real estate conveyed to Allen, $850.00 rent and $35,000.00 on the agreement not to compete, making a total of $60,950.00. The total paid by Spillman divided by the 458 shares equals $133.08 per share as the amount which Spillman paid for the shares.[2] The contract stated that Callao Bancshares was a bank holding company which owned a majority of the stock in the Callao Community Bank.

After acquiring his shares of Callao Bancshares, Spillman became active in the operation of Callao Community Bank. He thereafter became acquainted with F.A. Teter. Spillman asked Teter if he would be interested in buying the bank with Spillman. He told Teter that Allen had had a heart attack and he thought that he could buy it cheap. After further conversation, Teter agreed to purchase 83 shares of stock in Callao Bancshares for $58,000.00 or about $698.00 per share. Throughout the numerous conversations which Teter and Spillman had concerning the purchase by Teter of stock, Teter asked Spillman if Teter would be paying the same amount for his stock that Spillman had paid for his stock. Spillman assured him that they were paying the same amount, with the only difference being that Teter had the money to pay for his stock whereas Spillman had to borrow the money to pay for his. Thereafter, Spillman sold 21 shares of Callao Bancshares to Billy Teter and Betty Teter for $14,500.00 or about $690.00 per share. Billy asked Spillman if everyone was paying the same for their stock and Spillman assured him that everyone including himself was paying the same. Spillman also sold 21 shares to Larry Hyde and Dallie Hyde for $14,500.00. Spillman also told the Hydes that everyone including himself was paying the same for their stock.

Sometime later F.A. Teter saw Spillman on the street in Macon and told Spillman that "you didn't pay the same amount that I did." Spillman told him he did not. Spillman was asked at trial if it were absolutely true that Spillman did not pay as much as those to whom Spillman had sold stock and Spillman replied that he did not think that he ever denied that. Counsel then asked if Spillman was denying it at the time of trial and Spillman replied that he was not.

The purchasers of stock from Spillman filed suit on the theory that they had been induced to purchase their shares on the representation of Spillman that they were paying the same price per share that he

---

**2.** The total of $60,950.00 which Spillman paid to the Allens includes $35,000.00 for the non-compete agreement. The contract specified that amount to be paid for such agreement so that in actuality Spillman only paid $25,950.00 for the shares. However, no point is raised on this appeal concerning that fact.

had paid. The petition sought damages in an amount equal to the difference between what each party had paid Spillman for each of their shares and the amount Spillman had paid for each of his shares multiplied by the number of shares which each had purchased. The petition also sought punitive damages.

At the conclusion of the plaintiff's case, a conference occurred in chambers concerning the admissibility of evidence which Spillman proposed to elicit from Allen that Allen placed a value of $220,000.00 on the services of Spillman in obtaining a release of Allen from liability to Citizens Bank and Trust on the promissory note mentioned in the contract. It is agreed that the note was signed; "Callao Bancshares, Inc. by: A.H. Allen, President." Spillman sought to introduce this evidence to prove that he paid more for his shares than the contract provided and to prove that he paid as much for his shares as he charged the Teters and the Hydes for their shares. In addition, Spillman sought to show that Allen placed this value on Spillman's services because Spillman obtained a release of Allen from liability on a collateral pledge agreement which Callao Bancshares had given to Citizens Bank and Trust as security for its loan. Counsel for the plaintiffs presented a motion in limine to prevent Allen from testifying that he placed a value of $220,-000.00 on Spillman's services in connection with the release of the note and pledge agreement. The court sustained the motion in limine and ruled that Allen would not be allowed to testify to the $220,000.00 value which he placed on Spillman's services and which he considered to be additional value which Spillman paid for his shares. Spillman did not make an offer of proof concerning the proposed Allen testimony and now contends that the court erred in sustaining the motion in limine with respect to both the release of the note and the release of the pledge agreement.

The Teters and Hydes contend that Citizens Bank agreed to replace the note pursuant to its letter to Spillman which was dated a week prior to the date of the contract between Spillman and Allen and therefore Citizens Bank had agreed to re-lease the note prior to the execution of the contract between Allen and Spillman. For that reason Spillman could not have rendered any valuable services to obtain the release of a note which Citizens Bank had agreed to release prior to the Allen–Spillman contract. Further, they contend that Allen had no personal liability on the Citizens' note and therefore he required no services from Spillman to release Allen from personal liability on the note. They also contend that this point is not preserved for review because Spillman failed to make an offer of proof after the court sustained the motion in limine.

■ The court indicated in *Simpson v. Smith,* 771 S.W.2d 368, 371[1] (Mo.App. 1989), that it is not clear in this state whether or not an offer of proof is required after a motion in limine has been sustained. However, it is not necessary to address that question because the facts in this case eliminate the necessity of the offer of proof. Under the rule stated in *Kummer v. Cruz,* 752 S.W.2d 801, 807 (Mo.App. 1988), an offer of proof is not necessary when the purpose and purport of the testimony expected to be elicited are obvious. Here, the testimony which Spillman wanted to elicit from Allen was clearly stated and understood by the court and all parties. The matter was fully discussed and the court knew exactly what it was excluding in sustaining the motion in limine. Therefore, there was no necessity for an offer of proof.

■ On the merits of the proposed Allen testimony, Spillman contends that Allen feared that he was personally liable on the Citizens Bank note. That note was signed "Callao Bancshares, Inc. by: A.H. Allen, President" and attested to by the secretary of Callao Bancshares. In *Wired Music, Inc. v. Great River Steamboat Co.,* 554 S.W.2d 466, 468[3–5] (Mo.App.1977), it is stated that the general rule is that when the principal is disclosed and the capacity in which an individual signs is evident, such as president, the liability is that of the principal and not the individual signing for the principal. In this case Allen clearly

signed the Citizens' note as the disclosed agent of Callao Bancshares and therefore had no personal liability on the note. Spillman concedes that this is the law but reverts to a fall back position that the collateral pledge agreement which was given to secure the note was signed "Callao Bancshares, Inc, by: A.H. Allen" without any designation that Allen was an officer of the corporation. Spillman contends that Allen thought that he was personally liable on the pledge agreement because his office was not stated in connection with his signature and that Allen placed a $220,000.00 value on Spillman's services for removing his "possible" personal liability under the pledge agreement. Whether or not Allen was personally liable on the pledge agreement becomes immaterial in light of the fact that the note which the pledge agreement secured was released. Obviously, the pledge agreement was no longer valid after the release of the note. Further, the contract between Spillman and Allen made no reference to the pledge agreement, which is not mentioned because the contract called for the release of the note and the parties undoubtedly realized that such release would carry with it the release of the pledge agreement.

The consideration which Spillman was to pay Allen was spelled out in the contract and it was agreed that Citizens Bank had already agreed to cancel the note signed by Allen in his capacity as president of Callao Bancshares and that a new note would be executed by the officers of Callao Bancshares. In view of the fact that Allen could not be personally liable on the note, Allen should not be allowed to testify that he placed a value of $220,000.00 on services rendered by Spillman in connection with replacing the note. The court properly sustained the motion in limine as to both the note and pledge agreement.

■ Spillman finally contends that there is no evidence of damages to the persons who purchased stock from him. This case is similar to *Thompson v. Lyons*, 281 Mo. 430, 220 S.W. 942 (1920). In *Thompson,* the plaintiffs were induced to buy a tract of land on the representation that it cost a certain price when in fact it had cost only about half that sum. The court distinguished the situation in which false statements inducing a sale went to the quality, condition, or any fact which would enter into the value of the land. The court held that in that situation the measure of damages is the difference between the actual value and the value as it would have been if the property had been as represented. 220 S.W. at 949[11, 12]. The court further stated:

> But where one person makes a purchase for another, or where one of two or more joint purchasers conducts a joint purchase, and falsely represents to the others that the price is greater than is actually paid for the property, the measure of damages is always the difference between the amount actually paid by the party defrauded and the true purchase price of the interest which he acquired.

*Id.*

*Thompson* was followed in *Monsanto Chemical Works v. American Zinc, Lead & S. Co.*, 253 S.W. 1006, 1011[15] (Mo. 1923). There the plaintiff was induced to pay more for sulfuric acid than its contract provided on the representation that all other customers of American Zinc were paying more. The contention was made that no damages were shown but the court relied on *Thompson* that the damage was the amount which the plaintiff was induced to pay by reason of the fraud, or the amount which would put the defrauded party in status quo. *Id.*

Here, the Teters and Hydes were induced to pay $698.00 and $690.00 per share on the representation that Spillman was paying the same when in fact he was paying only about $133.00 per share. Under *Thompson* and *Monsanto* the evidence showed that the damage sustained by the Teters and Hydes was the amount which they paid per share above the amount paid by Spillman multiplied by the number of shares purchased. Spillman makes some argument that there was no damage because the value of the shares purchased was equal to the amount paid. However, as shown by *Thompson*, the theory was not

that the shares were of less value than the amount paid, but that the purchase was induced by the representation that Spillman was paying the same for his shares as he was charging for the shares he sold to the Teters and Hydes.

The judgment is affirmed.

All concur.